BEVERAGE MANAGEMENT,
INC., Plaintiff,

v.

COCA–COLA BOTTLING
CORP., Defendant.

No. C–1–84–1300.

United States District Court,
S.D. Ohio, W.D.

Aug. 29, 1986.

Michael K. Yarbrough, Columbus, Ohio, for plaintiff.

Glenn V. Whitaker, Cincinnati, Ohio, Thomas M. Green, Dayton, Ohio, for defendant.

OPINION; PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW SET FORTH; PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OVERRULED (DOC. # 2); PROCEDURES REQUESTED OF PLAINTIFF'S COUNSEL

RICE, District Judge.

After hearing the evidence presented by the parties, the Court advised the parties orally of its decision that Plaintiff had failed to establish its entitlement to a preliminary injunction. The Court now sets forth its written opinion, together with preliminary findings of fact and conclusions of law.

I. FINDINGS OF FACT

1. Plaintiff Beverage Management, Inc. ("BMI") filed a Complaint on August 31, 1984, against Defendant Coca-Cola Bottling Corporation ("Coca-Cola") seeking injunctive and declaratory relief and damages for alleged violations of Sections 1 and 2 of The Sherman Act, 15 U.S.C. §§ 1 and 2; Section 2(a), 2(d) and 2(e) of Robinson-Patman Act, 15 U.S.C. §§ 13(a), 13(d) and 13(e); and Ohio Revised Code § 1331.01 et. seq. On the same date, Plaintiff filed a Motion for Preliminary Injunction against Defendant Coca-Cola seeking an order enjoining Coca-Cola from offering and from continuing with any agreement which is conditioned upon the unreasonable exclusion of Plaintiff or any other national soft drink manufacturer from advertising in chain supermarkets. (Doc. # 2). Plaintiff also sought to enjoin Defendant from offering or continuing with any discriminatory promotional allowance or price discrimination.

2. Plaintiff BMI is an Ohio corporation engaged in the bottling and distribution of a variety of soft drinks—primarily 7–Up—

in a multi-state area including Ohio. BMI has divisions located in Greater Cincinnati and in Dayton, among other cities in Ohio, Michigan and Pennsylvania. Defendant Coca-Cola is a Delaware corporation with its principal place of business in Cincinnati, Ohio. Coca-Cola is engaged in the bottling and distribution of Coca-Cola brand and related soft drinks in and around the Cincinnati, Dayton, Northern Kentucky and Southwestern Ohio areas.

3. The specific agreement which Plaintiff seeks to enjoin is entitled "Cooperative Merchandising Agreement" ("CMA") and was signed by Coca-Cola and The Kroger Company ("Kroger"), through its merchandising manager for the Cincinnati-based Kroger marketing district, a district which encompasses Northern Kentucky, parts of Western Indiana, Dayton and Cincinnati. The term of this CMA is for the period January 2, 1984 through December 30, 1984. It was signed by representatives of Coca-Cola and Kroger on December 13, 1983.

4. Pursuant to the CMA offered to Kroger by Coca-Cola, Kroger may earn advertising allowances on a sliding scale ranging from $.08 to $.15 per case. These allowances are offered to Kroger in return for feature advertising in the various advertising media utilized by Kroger. The maximum allowance of $.15 per case is offered to Kroger in return for 27 ads featuring Coca-Cola brand products during the calendar year 1984. In order to qualify for the allowances, Kroger ads featuring Coca-Cola products in 16 oz. returnable and/or 2 liter packages are to be exclusive of any other ads for either 16 oz. returnables or 2 liter packages of directly competing national brand soft drinks.

5. The CMA which was signed by Kroger does not commit it to any specific number of weeks of feature advertising. Kroger is free to decide which soft drinks it will feature on a week to week basis, although it has made its decisions about feature advertising on a quarterly basis. Kroger is free to take advantage of the promotional offer or to not do so as it chooses.

Kroger's decision as to which soft drink it will feature in any advertising is based entirely upon Kroger's business interests and needs.

In March of 1984, representatives of Coca-Cola and Kroger met and determined that Kroger would receive the quarterly payments specified in the CMA on the basis of an estimate that Kroger would run from 24–26 feature ads in its flyers and that it would equal its 1983 sales of Coca-Cola in 1984.

6. Plaintiff has failed to establish, at least for purposes of injunctive relief, that Cincinnati is the relevant market from which it has been foreclosed by the allegedly unlawful conduct of Defendant Coca-Cola.

7. It is undisputed that among the leading national brand soft drinks sold within the time relevant to this suit in the Cincinnati/Dayton area, Pepsi-Cola is the market leader with approximately 40 to 45 percent of the relevant market, while Coca-Cola is second with approximately 30 to 35 percent of the relevant market and BMI's 7–Up has approximately 10 percent of the market.

8. All of the bottlers which produce national brand soft drink products offer competitive promotional offers to chain supermarkets in the Cincinnati/Dayton area.

9. The current program offered by Pepsi-Cola to Kroger provides for a volume incentive rebate of as much as $.10 per case plus certain advertising support which can amount to $.50 per case if Kroger agrees to run six feature ads per quarter on Pepsi-Cola products which are exclusive of feature ads on other competing soft drinks in the same package.

10. Both James Schultz of Coca-Cola and Paul Corden, General Manager of Plaintiff's Cincinnati Division, testified that from a marketing standpoint feature advertising exclusivity is something that is to be desired by soft drink bottlers. Competition in the soft drink industry is extremely intense in the Cincinnati/Dayton area. All of the bottlers in these areas utilize various

marketing devices to sell their products. Moreover, all of the bottlers have competed vigorously with one another to obtain sales to retailers such as Kroger by offering price discounts and promotional allowances for feature advertising. These discounts are often passed along to the consuming public by Kroger and other retailers.

11. Although Plaintiff has established that it has been unsuccessful in obtaining feature ads from Kroger in the Cincinnati area and that partly as a result of its inability to obtain feature ads, its sales to Kroger in Cincinnati have decreased in 1984, Plaintiff has not shown that Defendant's success in obtaining Kroger feature advertising is the result of any coercive, predatory, or unlawful means. Defendant's promotional program is one which could have been offered by Plaintiff, and in fact, a more lucrative proposal has been offered by Pepsi-Cola. Moreover, in meetings with Kroger, Plaintiff has attempted to explain to Kroger that it could obtain more promotional money from Plaintiff than from Coca-Cola or from Pepsi-Cola if Kroger chose to feature Plaintiff's 7-Up products.

12. Plaintiff has suffered from management difficulties in its Cincinnati division. Plaintiff's key account promotions manager has developed a personality problem with an important Kroger representative, and there have been shifts in personnel responsible for the Kroger account. In 1984, a new general manager was placed in charge of the BMI Cincinnati division, and there is evidence that the previous Cincinnati general manager who also controlled the Dayton division was successful in obtaining feature advertising with Kroger.

13. Although Plaintiff has presented evidence to show that Defendant's CMA offer to Kroger has resulted in Coca-Cola's obtaining feature advertising for Defendant's soft drinks, there has been no showing that Defendant's program is coercive. In fact, the evidence establishes that Defendant's CMA was offered to other chain supermarkets such as Thriftway, Larry's Finer Foods and Marsh Supermarkets, and that there have been no alleged coercive effects at such other establishments.

14. Despite the fact that Plaintiff competes with Defendant for feature advertising with Thriftway Supermarkets, the evidence establishes that Plaintiff's 7-Up products have actually increased their sales at Thriftway in 1984. Moreover, Plaintiff has obtained feature advertising from Larry's Finer Foods, another supermarket chain, while Defendant's CMA has been rejected by Larry's.

15. Although Plaintiff has established that its sales to Kroger have dropped in 1984, Plaintiff has been unable to establish that the drop in sales is entirely the result of its inability to obtain feature advertising. For example, Plaintiff has testified through its general manager that the pricing of Plaintiff's products by Kroger has been high in 1984 and, as a result, sales have been down. Soft drinks are price sensitive products, and their sales are influenced substantially by the price at which they are offered by chain supermarkets. The evidence establishes that Defendant has no control over pricing by Kroger or other chain stores.

## II. CONCLUSIONS OF LAW

1. The parties have not contested Plaintiff's standing under 15 U.S.C. §§ 15 and 26 to pursue its claims under Sections 1 and 2 of The Sherman Act, 15 U.S.C. §§ 1 and 2.

2. Plaintiff has not as yet made a sufficient showing of its standing to pursue relief under the Robinson-Patman Act, or under Ohio's Valentine Act. The Court does not consider either of these claims for relief in its ruling upon Plaintiff's Motion for Preliminary Injunction.

3. In the Sixth Circuit, four factors must be considered by the district court in determining whether to issue a preliminary injunction:

a) whether Plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

b) whether Plaintiff has shown irreparable injury;

c) whether the issuance of a preliminary injunction would cause substantial harm to others;

d) whether the public interest would be served by issuance of a preliminary injunction.

*Lakeshore Terminal and Pipeline Co., et al. v. Defense Fuel Supply Center, et al.,* 777 F.2d 1171 (6th Cir.1985); *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985); *Warner v. Central Trust Co., N.A.,* 715 F.2d 1121 (6th Cir.1983); *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100 (6th Cir.1982).

4. Given Plaintiff's investment sophistication, the requirements for issuance of a preliminary injunction should be strictly applied. *Warner,* 715 F.2d at 1123.

5. Under Section 1 of the Sherman Act, 15 U.S.C. § 1, it is Plaintiff's burden to establish that the 1984 CMA between Defendant and Kroger is an unreasonable restraint of trade. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978).

6. Under Section 2 of the Sherman Act, 15 U.S.C. § 2, it is Plaintiff's burden to establish that Defendant either unfairly attained or maintained monopoly power. *Smith v. Burns Clinic Medical Center, P.C.,* 779 F.2d 1173, 1175 (6th Cir.1985).

7. Plaintiff's analogy to the doctrine of exclusive dealing contracts under Section 3 of the Clayton Act, 15 U.S.C. § 14, is unpersuasive. The 1984 CMA is not equivalent to a requirements contract or an exclusive dealing arrangement.

8. Plaintiff has not established, at least for purposes of this decision, that the relevant market in this case is Cincinnati alone, rather than an area embracing both Cincinnati and Dayton.

9. The antitrust laws were enacted to protect "competition," not "competitors." Although the competitive market may not always function in a manner that the plaintiff likes, it has not shown that the operation of the market is a result of any illegal action on the part of the defendant, or that it (the Plaintiff) has sustained any antitrust injury. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 2740 n. 14, 81 L.Ed.2d 628 (1984); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300 (5th Cir. 1984); *Kaiser Aluminum v. Avondale Shipyards, Inc.,* 677 F.2d 1045 (5th Cir. 1982); *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,* 651 F.2d 76 (2d Cir.1981); *Berkey Photo, Inc. v. Eastman Kodak, Inc.,* 603 F.2d 263 (2d Cir.1979); *American Football League v. National Football League,* 323 F.2d 124 (4th Cir.1963).

10. The Defendant's feature advertising program does not secure for the company a competitive advantage through any unfair or predatory or illegal tactic.

11. The Defendant's promotional program is an ordinary marketing method that is available to all in the market. In fact, Plaintiff uses a comparable marketing method and its promotional program has been accepted over Defendant's program by certain independent soft drink retailers.

12. The Plaintiff has not been discouraged from engaging in competition in any aspect of the soft drink market, including the advertising and promotional facets of the market.

13. Plaintiff has not established that Defendant holds monopoly power in the soft drink market relevant to this case.

14. There is no evidence of either a conspiracy, or a concerted campaign on the part of the Defendant and any retailer of soft drinks to harm the Plaintiff.

15. The feature ads of soft drink retailers like Kroger cannot be considered analogous to an "essential facility," as that doctrine has developed in antitrust law. First, feature advertising is controlled by numerous independent retailers, and is not a centralized operation. Further, other advertising methods are available to the Plaintiff in

its efforts to compete in the soft drink sales market. Finally, Defendant does not have control over Kroger's feature ads. *See United States v. St. Louis Terminal,* 224 U.S. 383, 392–393, 32 S.Ct. 507, 508–509, 56 L.Ed. 810 (1911); *Hecht v. ProFootball, Inc.,* 570 F.2d 982 (D.C.Cir.1977); *Helix Milling Company v. Terminal Flour Mills Co.,* 523 F.2d 1317 (9th Cir.1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 782, 46 L.Ed.2d 642 (1976). *See also, Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *Tampa Electric Co. v. Nashville Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1960); *Fishman v. Wirtz,* 1981–2 Trade Cases (CCH), ¶ 64,378 (N.D.Ill.1981).

16. Plaintiff has failed to establish a probability of success on the merits of its claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

17. The Court does not resolve the issue of whether Plaintiff has made a sufficient showing of irreparable injury.

18. The Court does not resolve the issue of the potential for substantial harm to others.

19. Plaintiff has failed to establish that the issuance of an injunction would serve the public interest.

## III. APPLICABLE LEGAL STANDARDS

### A. *Standing*

Plaintiff invokes the jurisdiction of this Court under Sections 4 and 16 of the Clayton Act, and asks the Court to extend pendent jurisdiction to its state law claim. Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained....

Section 16 of the Clayton Act, 15 U.S.C. § 26, provides for injunctive relief for private parties against threatened loss or damage by a violation of the antitrust laws.

Plaintiff's standing to pursue relief for violations of Section 1 and 2 of the Sherman Act is clear, and the parties have not contested this issue. The Court finds, however, that there has not as yet been a sufficient showing of Plaintiff's standing to bring its claims under the Robinson-Patman Act. Nor has Plaintiff attempted to justify its pursuit of relief under Ohio law. Therefore, the Court confines its inquiry to whether Plaintiff has made a sufficient showing to warrant a preliminary injunction under the Sherman Act.

### B. *Requirements for a Preliminary Injunction*

In this Circuit, it is well established that a district court, in exercising its discretion to sustain or to overrule a motion for a preliminary injunction, must consider four factors:

(1) Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

(2) Whether the plaintiff has shown the threat of irreparable injury(ies) should an injunction not issue;

(3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) Whether the public interest would be served by issuing a preliminary injunction.

*Warner v. Central Trust Co., N.A.,* 715 F.2d 1121, 1123 (6th Cir.1983); *American Motors Sales Corp. v. Runke,* 708 F.2d 202, 205 (6th Cir.1983), *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 102 (6th Cir.1982); *Bossert v. Springfield Group, Inc.,* 579 F.Supp. 56, 62 (S.D. Ohio 1984).

In *Friendship Materials,* the Sixth Circuit observed that the lower court had employed an "alternate test" known as the "balance of hardships" test in granting the injunctive relief sought by plaintiff therein. The "balance of hardships" test permits a preliminary injunction to be granted even where a plaintiff fails to show a strong or substantial probability of ultimate success

on the merits of his or her claim, but where plaintiff at least shows serious questions going to the merits and irreparable harm decisively outweighing any potential harm to the defendant stemming from issuance of an injunction. 679 F.2d at 104. After scrutinizing the record, the *Friendship Materials* court found that the district court had granted an injunction under the "balance of hardships" test without any express findings as to the irreparable harm plaintiff would suffer in the absence of injunctive relief. On the basis of this deficiency, the Sixth Circuit vacated the preliminary injunction, and remanded the matter to the district court for further proceedings. 679 F.2d at 102.

The following year, in *Warner v. Central Trust Co., N.A.,* the Sixth Circuit observed that while the *Friendship Materials* court had stressed the need for flexibility in the application of the four factors traditionally governing the issuance of injunctive relief, the court had nonetheless stopped short of expressly adopting the "balance of hardships" test. 715 F.2d at 1123. *Warner* involved a suit by plaintiff to enjoin the Central Trust Company from honoring the standby letter of credit which he had previously procured from them. The *Warner* court held that the district court had been correct in strictly applying the four-factor test for injunctive relief due to the investment sophistication of the party seeking that extraordinary remedy. It further ruled that injunctive relief had properly been denied to plaintiff due to his inability to establish either a substantial likelihood of success on the merits or irreparable injury. 715 F.2d at 1124.

■ BMI contends that injunctive relief in the instant case is warranted, even without a showing of a probability of success on the merits, so long as it establishes that the harm which it will suffer in the absence of a preliminary injunction will outweigh any harm to Defendant stemming from its issuance. This Court does not read prevailing Sixth Circuit opinions as does Plaintiff, however. Recent Sixth Circuit opinions have continued to adhere to the traditional four-part test for injunctive relief without mention of the "balance of hardships" test mentioned in *Friendship Materials.* *Turner v. Heckler,* 783 F.2d 657, 662 (6th Cir.1986); *Frisch's Restaurant v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir. 1985).

This Court's denial of Plaintiff's Motion for a Preliminary Injunction rests upon its belief that at least two of the requisites for the issuance of a preliminary injunction—probability of success on the merits and the public's interest in the injunction sought—have not been satisfied. Even assuming *arguendo* that Plaintiff has properly stated the test for injunctive relief and that all that is required is a serious question going to the merits, which this Court does not concede, there has not been a sufficient showing by Plaintiff of such a serious question as to the merits for injunctive relief to issue.

### C. *Requirements for Antitrust Liability*

While Plaintiff has alleged violations by Defendant of Sections 1 and 2 of the Sherman Act, Plaintiff's claim under Section 1 implicates a line of cases decided under Section 3 of the Clayton Act (hereinafter referred to simply as Sections 1, 2 and 3). The Court thus briefly considers the standards which govern liability under these three statutes.

Section 1 of the Sherman Act provides in relevant part that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1. As Plaintiff makes no claim that Defendant's arrangement with Kroger is a *per se* violation of Section 1, the 1984 CMA must be judged under a rule of reason, "an inquiry into market power and market structure designed to assess the combination's actual effect." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). It is Plaintiff's burden to establish that the 1984 CMA violates Section 1 as an unreasonable restraint of trade. *National Society of*

*Professional Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 265 (7th Cir.1981); *cert. den.,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982).

Section 2 of the Sherman Act provides in relevant part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states ... shall be guilty of a misdemeanor." 15 U.S.C. § 2. To establish the offense of monopolization, a plaintiff must demonstrate that a defendant either unfairly attained or maintained monopoly power. Monopoly power consists of the "power to control prices or exclude competition." *Smith v. Burns Clinic Medical Center, P.C.,* 779 F.2d 1173, 1175 (6th Cir.1985). An attempted monopolization occurs when a competitor, with a "dangerous probability of success," engages in anticompetitive practices the specific design of which are to build a monopoly or to exclude or destroy competition. Plaintiff must establish, in order to succeed on either a monopolization or attempt to monopolize claim, the relevant product and geographic markets in which they compete with the alleged monopolizers. *Id.* at 1175–1176.

Section 3 of the Clayton Act was intended by its drafters to supplement the Sherman Act by making illegal certain specific restraints of trade that the courts had found to be outside the scope of the Sherman Act. IV E. Kintner, Federal Antitrust Law, § 32.9 at 14–15. Section 3 provides in relevant part that "[i]t shall be unlawful ....to lease or make a sale or contract for sales of goods ... for use, consumption, or resale ... on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor ... where the effect of such lease, sale or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.

A comparison of Section 3 of the Clayton Act with Section 1 of the Sherman Act, a comparison relevant to this case given Plaintiff's reliance upon Section 3 case law in its Section 1 claim, reveals that Section 3 is in some ways narrower than Section 1 and in some ways broader than Section 1. Section 3 is narrower in the sense that exclusive dealing arrangements which do not meet Section 3's technical requirements may be found to violate Section 1. An exclusive dealing arrangement for the provision of services rather than for a sale of goods, for example, would fall outside the statutory scope of Section 3. Section 3 precedent, however, could nonetheless be employed in an analysis of whether such an exclusive dealing arrangement constituted an unreasonable restraint of trade under Section 1. *Dos Santos v. Columbus-Cuneo-Cabrini Med. Center,* 684 F.2d 1346, 1352 & n. 11 (7th Cir.1982); *Barnosky Oils, Inc. v. Union Oil Co. of Cal.,* 665 F.2d 74, 85 (6th Cir.1981); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1250 (3d Cir.1975).

Section 3 is less restrictive than Section 1 for the reason that a violation of Section 3 may be established upon a showing that anticompetitive effects are *probable* as a result of the exclusive dealing arrangement. By contrast, proof that an exclusive dealing arrangement has actually *had* an anticompetitive effect in the marketplace is required in order to establish a violation of Section 1. *Twin City Sportserv., Inc. v. Charles O. Finley & Co.,* 512 F.2d 1264, 1275 (9th Cir.1975), *after second trial,* 676 F.2d 1291, 1304 n. 9 (9th Cir.1982); IV Kintner, § 32.9 at 16.

The Supreme Court's decision in *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), has been relied upon by the lower courts both for its elaboration of Section 3 and for its indication as to the relationship between Section 3 and Section 1 of the Sherman Act. In *Tampa Electric,* a 20–year requirements contract for the purchase of coal was at issue. The Supreme Court observed that, to establish a violation of Section 3,

the competition foreclosed by the contract had to be found to constitute a substantial share of the relevant market. The Court further explained:

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

365 U.S. at 329, 81 S.Ct. at 629.

The *Tampa Electric* court, after rigorously redefining the relevant market and finding that the foreclosure of competition amounted to less than one percent of the coal marketed in the pertinent producing area, found that the contract did not have the probable effect of foreclosing a substantial volume of competition. *Id.* at 335, 81 S.Ct. at 632. The Court then stated that it had no need to evaluate the Sherman Act challenges to the requirements contract, given that the contract had passed muster under Section 3. *Id.* Lower courts have gleaned from *Tampa Electric* that while the analysis of *Tampa Electric* is applicable to a Section 1 analysis of an exclusive dealing arrangement, *cf. Barnosky*, 665 F.2d at 84–85, Section 1 of the Sherman Act still requires that the actual anticompetitive effect of the exclusive dealing arrangement be proven. *Twin City Sportserv., Inc.*, 512 F.2d at 1274–1275.

## IV. DISCUSSION

### A. *The 1984 CMA Between Coca-Cola and Kroger*

Plaintiff contends that it is entitled to preliminary injunctive relief on the grounds that Coca-Cola's 1984 CMA with Kroger has effectively "locked out" BMI from the Kroger feature ad market in a manner violative of the antitrust laws. A brief recap of the workings of the CMA, and Plaintiff's interpretation of that arrangement, is helpful at this juncture.

Reference to Exhibit 2, the 1984 CMA between Coca-Cola and Kroger, reveals that payments to Kroger are made on the basis of two considerations: (1) a monetary allowance per case of Coca-Cola sold based on the number of exclusive feature ads for Coca-Cola products in Kroger flyers, and (2) a bonus allowance per case of Coca-Cola sold, provided that Kroger sells at least as many cases of Coca-Cola in 1984 as it did in 1983. The feature ad allowance increases as the number of feature ads increase, that is to say, Kroger earns more per case of Coca-Cola as the number of feature ads in Kroger flyers increases. The maximum number of feature ads contemplated in the CMA is 27 Coca-Cola feature ads. The bonus allowance per case of Coca-Cola also increases if Kroger sells five percent or ten percent more cases of Coca-Cola than it did in 1983.

The 1984 CMA, signed by representatives of Coca-Cola and Kroger on December 13, 1983, contemplated quarterly payments by Coca-Cola to Kroger. In March of 1984, prior to the first of these payments, James Schultz of Coca-Cola met with Michael Meisner of Kroger. The purpose of the meeting was to anticipate the payments which Coca-Cola would make to Kroger over the year by estimating the feature ad allowance per case and bonus allowance per case which would be paid to Kroger under the CMA. No firm agreement was reached at this meeting whereby Kroger committed itself to run a certain number of feature ads. Six Coca-Cola feature ads had appeared in Kroger flyers as of the date of the meeting. The decision was made to pay Kroger $.23 per case of Coca-Cola sold. This figure represented an estimate that Kroger would feature Coca-Cola 24–26 times in its flyers, earning $.13 per case sold, and that Kroger would equal its 1983 sales of Coca-Cola in 1984, earning $.10 per case sold. Kroger has been paid

promotional allowances on the basis of this estimate throughout the year.

As of the date of the hearing in this matter, Kroger had run 21 feature ads in 1984 advertising Coca-Cola products in its flyers. The impact of this is as follows. Were Coca-Cola, hypothetically, to run no additional Coca-Cola feature ads in its flyers throughout the remainder of 1984, it would owe Coca-Cola $.02 per case of Coca-Cola that it has sold. This figure arises from the difference between the $.13 which Kroger earns per case of Coca-Cola sold if it runs 24–24 ads in its flyers and the $.11 which it earns if it run 19–23 ads. If at the end of 1984 Kroger fails to equal its 1983 case sales of Coca-Cola—and Plaintiff's position is that Kroger cannot meet its 1983 sales of Coca-Cola without featuring Coca-Cola products in its flyers—then Kroger must repay Coca-Cola the $.10 per case which represents the bonus allowance per case sold in the event that Kroger equals its 1983 case sales of Coca-Cola.

To complete the hypothetical, if Kroger runs three to five more feature ads in the fourth quarter of 1984, and meets its 1983 sales target in the process—another of Plaintiff's assumptions—then Kroger's promotional allowances in the fourth quarter will remain at the same $.23 per case of Coca-Cola sold.

These scenarios under the 1984 CMA are the basis for Plaintiff's contention that Coca-Cola has brought improper pressure to bear upon Kroger by virtue of the lucrative terms of the 1984 CMA. Plaintiff submits that Pepsi-Cola, the market leader in southern Ohio, has been forced to combat Coca-Cola by designing quarterly plans of its own in 1984. These quarterly plans contain a volume incentive component providing promotional allowances on all cases of Pepsi-Cola sold by Kroger in 1984 in exchange for a certain number of feature ads each quarter in Kroger flyers. The end result of this feature activity, Plaintiff concludes, is that it has been barred in 1984 from gaining exposure for its produces through Kroger feature ads.

## B. *Probability of Success on the Merits*

In attempting to establish the probability of success on the merits necessary to procurement of injunctive relief, Plaintiff takes two slightly different approaches. In its Motion for Preliminary Injunction (Doc. # 2 at 9–10) and in its Reply Memorandum (Doc. # 7 at 15–17), Plaintiff analogizes Coca-Cola's 1984 CMA with Kroger to an exclusive dealing arrangement, and contends that this arrangement would violate Section 1 of the Sherman Act if it "actually or potentially lessens or forecloses competition in a relevant market in a substantial way." (Doc. # 7 at 15). Drawing upon Section 3 cases such as *Tampa Electric*, Plaintiff contends that it has been illegally foreclosed from 14 percent of the market for national brand soft drinks in the Cincinnati area, that figure representing Plaintiff's calculation as to the percentage of the total volume of national brand soft drinks sold in the Cincinnati area as a direct result of Kroger's feature ad promotions.

In Plaintiff's Supplemental Post-Hearing Brief (Doc. # 10 at 2–4) and its Proposed Findings of Fact and Conclusions of Law (Doc. # 13 at 4–5), Plaintiff appears to back away from the characterization of the CMA as an exclusive dealing arrangement. Instead, Plaintiff informs the Court, citing *Dos Santos*, 684 F.2d at 1346, that Section 1 precludes unreasonable restraints of trade, regardless of whether or not an exclusive dealing arrangement is involved. Having considered Plaintiff's arguments and its citations of authority, this Court finds that Plaintiff has failed to establish a probability of success on the merits of its claims under Sections 1 and 2 of the Sherman Act.

### 1. *Exclusive Dealing*

█ Plaintiff contends that it has been or will be foreclosed from 14 percent of the relevant market for national brand soft drinks sold in Cincinnati, and that this percentage of foreclosure is not only "substantial" within the meaning of *Tampa Electric*, but that this percentage of foreclosure

exceeds the percentages of market foreclosure found illegal in several Section 3 cases. *See Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1948) (6.7 percent of total gallonage of gasoline sold in relevant market found to be foreclosure violative of Section 3); *Mytinger & Casselberry, Inc. v. FTC*, 301 F.2d 534 (D.C.Cir.1962) (8.6 percent of retail sales in relevant market found to be foreclosure violative of Section 3); *Cornwell Quality Tools v. C.T.S. Co.*, 446 F.2d 825 (9th Cir.1971) (10 percent of tool dealer market sufficient for issue of foreclosure to be submitted to the jury).

This Court has two major points of disagreement with Plaintiff's comparison of the cited cases to the instant facts. First, *Standard Oil* involved exclusive supply contracts between Standard Oil and independent dealers. *Mytinger* involved exclusive sales contracts whereby plaintiff's distributors could not sell or distribute any of the products of plaintiff's competitors. In *Preformed Line Products Co. v. Fanner Mfg. Co.*, 328 F.2d 265, 277 (6th Cir.1964), also relied upon by Plaintiff, plaintiff had required "General Electric Supply Company to buy all of its products from plaintiff as a condition of purchasing any products from plaintiff." While Coca-Cola has raised the competitive stakes with its promotional program, this Court does not accept that the economic incentives presented to Kroger under the 1984 CMA render this advertising arrangement equivalent to a requirements contract or an exclusive dealing contract for the provision of services.

Retailers are free to participate in Coca-Cola's feature ad programs, or to decline them in favor of another soft drink manufacturers. On the basis of the testimony presented at the hearing, Kroger is by all accounts still solicited by BMI and by Pepsi-Cola and continues to make its own decisions as to which bottler's products to feature. The fact that Kroger has accepted sums under the feature ad or volume incentive component of the 1984 CMA, with the risk that it may not meet the terms of these bonus programs, simply does not transform Defendant's promotional advertising program into a contract which prohibits Kroger from featuring a BMI product such as 7-Up, or any other soft drink, in its flyers.

Second, the cases cited by Plaintiff, particularly *Tampa Electric*, indicate the resistance of other courts, when evaluating charges of illegal foreclosure, to an overly-narrow definition of the relevant market. Although this Court is not as yet prepared to rule definitively (upon the merits of this case) as to the relevant market for purposes of Plaintiff's claim, the following facts indicate to this Court the possibility that Plaintiff may have been overly restrictive in defining Cincinnati to be the relevant market from which it has been foreclosed: (1) the 1984 CMA covers Kroger stores in Dayton as well as in Cincinnati; (2) identical flyers are published and distributed by Kroger for consumers in Dayton and Cincinnati; (3) BMI's own promotional offers to Kroger have contemplated feature activity in Kroger stores in both Dayton and Cincinnati. Given this information, Plaintiff's argument that it has been foreclosed from 14 percent of the relevant market, that being only the Cincinnati market, will likely prove untenable.

For these reasons, this Court concludes that Plaintiff has not established a probability of success under Section 1 of the Sherman Act on the basis of its analogy to exclusive dealing contracts under Section 3 of the Clayton Act.

### 2. *Unreasonable Restraint of Trade*

As mentioned previously, Plaintiff reminds this Court that Section 1 precludes unreasonable restraints of trade, regardless of whether or not an exclusive dealing arrangement is involved (Doc. # 13 at 4–5). The cases which Plaintiff has cited in support of this proposition, however, involve exclusive dealing arrangements which were evaluated under Section 1, *e.g., Dos Santos*, 684 F.2d at 1346; *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230 (3d Cir.1975), an analogy which this Court has already found unpersuasive.

The Court is also mindful of the admonition of the Supreme Court that the "antitrust laws ... were enacted for the protection of *competition,* not *competitors." Copperweld,* 104 S.Ct. at 2740 n. 14 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Accordingly, the Court turns to consideration of several cases in which competitive marketing practices have been upheld over challenges under Section 1 and Section 2 of the Sherman Act, even when the challenged party enjoyed a monopoly in the relevant market.

In *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), plaintiff, a small participant in the amateur photographic industry, challenged giant rival Eastman Kodak's simultaneous introduction of a new small camera and a new line of film especially designed for use with small cameras. Among the claims put forward by Berkey Photo was that Kodak had violated Section 2 of the Sherman Act due to its advertising outlays encouraging the public to jointly consider the new film and the new camera. The Second Circuit ruled that the marketing strategy of introducing both products to the market simultaneously was not a type of coercion violative of the antitrust laws, even though Defendant dominated the relevant market. 603 F.2d at 287. Nor did the court find unlawful the advertising revenues expended by Kodak to emphasize both new products, observing that "[a] monopolist is not forbidden to publicize its product unless the extent of this activity is so unwarranted as to constitute an entry barrier." *Id.*

Marketing practices challenged under Sections 1 and 2 of the Sherman Act were similarly upheld by the 2nd Circuit in *Northeastern Tel. Co. v. Amer. Tel. & Tel. Co.,* 651 F.2d 76 (2nd Cir.1981), *cert. den.* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Defendant AT & T, a monopolist, had introduced a payment system which divided its customers' telephone charges into capital and operating cost components. After several years of telephone service with AT & T, a customer could exhaust the capital charges for his or her telephone

system, and then only be required to pay for the cost of operating that system. AT & T introduced its two-tier payment option in different segments of its business as they came under attack by its new, smaller rivals. Plaintiff, one of those rivals, contended that the monetary consequences of the two-tier plan locked customers into using defendant's services for the useful life of their telephone systems and as such constituted an anticompetitive practice. The Second Circuit disagreed as a preliminary matter with plaintiff's conclusion as to the economic lock-in produced by defendant's payment device, noting that a termination credit provided under the plan would allow a customer to recoup at least part of his or her capital investment upon deciding to stop using defendant's system. It went on to conclude that the financial incentives presented by the two-tier payment system were no more anticompetitive than the typical factors influencing a consumer purchase:

[T]he incentives operating on a SNET customer who elects the two-tier plan are similar to those applicable to a new owner of a Northeastern PBX. Just as a SNET customer is unlikely to purchase Northeastern's product, the latter is unlikely to switch to SNET's terminal equipment. Thus, SNET's use of the two-tier plan is no more anticompetitive than Northeastern's practice of selling PBX's. Neither one is an action that is "possible or effective only if taken by a firm that dominates its smaller rivals." *Berkey, supra* 603 F.2d at 275. On the contrary, both are "ordinary marketing methods available to all in the market." *Telex Corp v. International Business Machines Corp.,* 510 F.2d 894, 926 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

651 F.2d at 93.

In *Bayou Bottling, Inc. v. Dr. Pepper Co.,* 725 F.2d 300 (5th Cir.1984), *cert. den.* 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984), a wholesaler and distributor of Pepsi-Cola and 7–Up brought suit under the antitrust laws against Dr. Pepper and one

of its local bottlers on the basis of their allegedly exclusionary conduct. Among the practices challenged by Plaintiff was defendants' provision of free maintenance and services for local retailers' soft drink vending machines and coolers on the condition that only Defendants' soft drinks be stocked in those machines and coolers being serviced by Defendants free of charge. The Fifth Circuit, however, was not persuaded by plaintiff's argument that such a practice stated a violation under Sections 1 and 2 of the Sherman Act. Citing the decision of the Second Circuit in *Northeastern Tel. Co. v. Amer. Tel. & Tel. Co.*, the Fifth Circuit held that Defendants' marketing activities were competitive practices not barred by the antitrust laws. 725 F.2d at 304.

■ This Court does not read prevailing authority under Sections 1 and 2 of the Sherman Act as automatically equating business frustrations stemming from a rival's competitive practices with violations of the antitrust laws. The case law establishes that even were Coca-Cola a monopolist in the relevant market, which Plaintiff has not yet established, it would still have the option of employing "ordinary marketing methods available to all in the market" to make its promotional offers the most attractive to Kroger. Through use of its ad feature and volume incentive programs in the 1984 CMA, Defendant has shaped financial incentives in the hopes of persuading Kroger to feature its soft drinks in Kroger's flyers. Like Coca-Cola, Plaintiff too has shaped financial incentives in 1984 in such a way as to attempt to persuade Kroger to feature 7-Up and other BMI products.

While the terms of the 1984 CMA have been among the factors which have influenced Kroger's decision as to which products to feature, the evidence has shown that considerations as to the drawing power of a featured soft drink and perhaps even interpersonal relations are among the other factors which have influenced Kroger's ad feature activity in its flyers. The fact that Plaintiff's promotional offers have not proven sufficient vis-a-vis the other factors in Kroger's calculus for Plaintiff to have prevailed in the highly competitive struggle for feature ads in Kroger flyers does not establish that Defendant, one of Plaintiff's rivals, has engaged in an unreasonable restraint of trade. Not finding a probability of success on the merits on the theory that Defendant's CMA constitutes an unreasonable restraint of trade, the Court now turns to Plaintiff's third contention under the Sherman Act.

### 3. *"Essential Facility" Doctrine*

Plaintiff contends that Kroger feature ads constitute an essential facility, and that the denial to it of access to this essential facility inflicts a "severe handicap" to its ability to compete with those soft drink bottlers who have secured access to feature ads in Kroger flyers.

■ Four elements are required to establish liability under Section 1 or 2 of the Sherman Act by virtue of the essential facilities doctrine: (1) control of the essential facility by a business or group of businesses; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility. *MCI Communications v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1132–33 (7th Cir.1983); *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843, 856 (6th Cir.1979). The seminal case under this doctrine is *United States v. Terminal Railroad Assoc.*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), where a group of railroads acquired ownership over a facility—a huge train station, the only existing railroad bridge, and every connection between the bridge and railroads terminating on either side of the Mississippi River—which constituted the only feasible terminal for rail traffic coming to St. Louis from the West. The Supreme Court ruled that the terminal owners had to make the facility equally accessible to all users. 224 U.S. at 411, 32 S.Ct. at 516.

This Court is not at all certain, given the interpretation of the essential facility doc-

trine which has grown in the wake of *Terminal Railroad*, that Kroger feature ads can be found to be an essential facility. The theory behind the essential facility doctrine rests on the notion of a "bottleneck" in a particular line of business which can be manipulated so as to eliminate competitors. The sole flour mill in a particular region, *Helix Milling Co. v. Terminal Flour Mills Co.*, 523 F.2d 1317, 1320 (9th Cir.1975), sports stadiums serving large metropolitan areas, *Fishman v. Wirtz*, 1981–82 Trade Cases (CCH), ¶ 64,378 (N.D.Ill.1981), electric power transmission lines, *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) and the terminal facility in *Terminal Railroad, supra*, have been found by the courts to be "bottlenecks" whose use was integral to a competitor's survival in a particular industry. Unlike the structures in those cases and their relationships to productivity in particular economic sectors, Kroger feature ads, although an excellent means of reaching Cincinnati or Dayton consumers, are certainly not the *only* way for a soft drink bottler in Cincinnati or Dayton to arouse interest in its products.

■ Even assuming *arguendo* that Kroger's feature ads could constitute an essential facility, this Court cannot accept that Defendant has had the control over Kroger's feature ads necessary for liability under the essential facility doctrine. All the evidence attests to the fact that Kroger makes its own decisions, whether weekly or quarterly, as to which soft drinks to feature in its flyers. However tempting the offers made to Kroger by soft drink bottlers in order that particular soft drinks be featured in Kroger flyers, Kroger may choose among them as it sees fit. It is under no legal compulsion to do otherwise; nor can this Court accept any argument that the terms of Defendant's CMA have enabled it to dictate to Kroger the contents of Kroger feature ads. As the first criterion for liability under the essential facility doctrine is not found to have been satisfied, the Court will not proceed with the remaining criteria for liability under the essential facility doctrine.

As the Court has not found a probability of success on the merits with respect to any of Plaintiff's theories of antitrust liability, it finds that Plaintiff has failed to meet the requirements in this Circuit for issuance of a preliminary injunction.

## C. Other Factors Concerning Preliminary Injunctive Relief

Of the three remaining parts of the test for a preliminary injunction, the Court concludes that the fourth and final factor—whether the public interest would be served by the issuance of an injunction—is not satisfied herein and as such supports a denial of injunctive relief. The Court is not inclined to rule on the two remaining factors of irreparable injury or substantial harm, but will outline its considerations as to those factors.

With respect to the second factor, the threat of irreparable injury(ies) to Plaintiff, the Court notes Plaintiff's own admission in its Supplemental Post-Hearing Memorandum that its loss of sales resulting from Defendant's allegedly unlawful arrangements with Kroger can be translated into a readily determinable dollar amount (Doc. # 9 at 7). Despite this ability to quantify its harm in financial terms, Plaintiff's position is that its inability to procure feature ads in Kroger flyers in 1984 has seriously damaged its goodwill, reputation and credibility in the eyes of the consuming public.

The cases provided by Plaintiff to this Court for purposes of establishing the severity of its damages with respect to goodwill and the like focus primarily upon irreparable injury in the context of the termination of franchise or wholesale distributorship relationships, where termination of said relationships threatened the franchisees or distributees in question with an inability to thereafter sell the products of their former franchisor or distributor. *See Steinberg v. Cheker Oil Co.*, 573 F.2d 921 (6th Cir.1978); *Erewhon, Inc. v. Northeast Health Food Merchants*, 428 F.Supp. 551 (D.Mass.1977); *McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc.*, 235

F.Supp. 743 (E.D.Pa.1964). Such authority is not altogether persuasive given that Kroger retains the discretion to feature BMI products and that it continues to stock and sell BMI products in the normal course of its retail operations. The Court is, however, mindful of Paul Corden's testimony on behalf of BMI as to the difficulties in rebuilding consumer confidence and as to the potential for lay-offs in Plaintiff's bottling facilities. As a result, the Court refrains from conclusively resolving the question of irreparable injury.

With respect to the third factor, the potential for substantial harm to others, the Court notes the likelihood of administrative confusion and financial loss to Coca-Cola upon issuance of the injunction sought herein. Given the coverage of the 1984 CMA of Kroger stores in both Cincinnati and Dayton, an injunction of the CMA only in Kroger stores in Cincinnati could prove unwieldy as Defendant attempts to sever or recast its arrangements in some stores while retaining the CMA in others. While the costs of the 1984 CMA both in terms of formulation and actual payments to Kroger were weighed in terms of the ability of the plan to meet Defendant's competitors' offerings throughout 1984, an injunction would disrupt these calculations. Instead, losses due to the freezing of the CMA would be coupled with new outlays for fourth quarter promotional plans designed to capture Kroger's interest over Pepsi-Cola's current quarterly plan and BMI's new offers.

The concerns as to administrative confusion outlined above appear to be equally relevant for Kroger. With respect to financial losses to Kroger stemming from an injunction, it is possible that losses to Kroger due to an injunction of the 1984 CMA could be matched or perhaps surpassed by new fourth quarter promotional offers from BMI, Coca-Cola or other bottlers. None of these new offers, however, would erase the fact that they were entertained only after Kroger's independent business judgment in securing and arranging its feature ads was interfered with by this Court's issuance of injunctive relief to BMI.

With respect to the fourth factor, whether issuance of an injunction would serve the public interest, the Court finds itself unable to accept Plaintiff's contention that an injunction will allow Cincinnati consumers the free choice in the selection of soft drink products which they are currently denied by virtue of the current Coca-Cola program with Kroger. From this Court's perspective, Cincinnati consumers already have this free choice. They have been able to buy 7-Up, as well as Coca-Cola, Pepsi-Cola, and other bottled soft drinks, in Kroger stores in Cincinnati. They have also enjoyed low retail prices on certain soft drink packages due to Kroger's acceptance of promotional offers from those bottlers whose products have the strongest appeal to Kroger consumers. An injunction in the instant case will not ensure that consumers in Cincinnati will be able to buy products previously unavailable to them in Kroger stores. Nor will it ensure that national brand soft drinks, including 7-Up, will be offered to them at low prices. Rather, to the extent that an injunction raises costs to Kroger and interferes with its decision-making, Kroger consumers in Cincinnati could even be presented with less favorable soft drink pricing. Thus, the second basis for the Court's denial of the preliminary injunctive relief sought herein is that such relief would not serve the public interest.

## V. CONCLUSION

The Court concludes that Plaintiff has failed to establish two of the requirements for the issuance of a preliminary injunction, probability of success on the merits of its claims under the Sherman Act and the public's interest in the injunction sought. Accordingly, Plaintiff's Motion for Preliminary Injunction (Doc. # 2) is denied. The Court does not reach Plaintiff's claims under the Robinson-Patman Act or under Ohio's Valentine Act.

Within 20 days from date of receipt of notice of this Opinion, Plaintiff's counsel should advise this Court as to the wishes of

the Plaintiff with regard to further prosecution of this lawsuit. Should Plaintiff wish to proceed to trial upon the merits, the Court will convene an immediate conference call, between Court and counsel, and a trial date and other pertinent dates will be set.