EQUIPMENT DISTRIBUTORS' COALITION, INC., Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

The Mountain States Telephone & Telegraph Co., et al., BellSouth Corporation, et al., the North American Telecommunications Assoc., AT & T Information Systems, Inc., ROLM Corporation, Bell Atlantic Telephone Companies, NYNEX Corporation, Ameritech Operating Companies, Intervenors.

NORTH AMERICAN TELECOMMUNICATIONS ASSOCIATION, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

The Mountain States Telephone & Telegraph Co., et al., ROLM Corporation, AT & T Information Systems, Inc., Bell Atlantic Telephone Companies, BellSouth Corporation, Ameritech Operating Companies, NYNEX Corporation, Intervenors.

Nos. 85–1391, 85–1433.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 13, 1987.

Decided July 31, 1987.

Anne K. Bingaman and Albert H. Kramer, with whom Denise Bonn and Michael E. Fine, Washington, D.C., were on brief, for petitioners.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Com'n, with whom Jack D. Smith, General Counsel, Daniel M. Armstrong, Associate General Counsel, Jane E. Mago, Counsel, F.C.C., Catherine G. O'Sullivan and Andrea Limmer, Dept. of Justice, were on brief, for respondents; Linda Oliver, counsel, F.C.C., Washington, D.C., also entered an appearance for respondents.

Jules M. Perlberg, with whom Jonathan S. Hoak and C. John Buresh, Chicago, Ill., were on brief, for intervenor, AT & T Information Systems, Inc.

Vincent L. Sgrosso and R. Frost Branon, Jr., were on brief for intervenors, BellSouth Corp., et al; John F. Beasley and Norman C. Frost, Chicago, Ill., entered appearances for intervenors, BellSouth Corp., et al.

Robert B. McKenna, Washington, D.C., entered an appearance for intervenors, The Mountain States Telephone & Telegraph Co., et al.

Mary Jo Manning, Washington, D.C., entered an appearance for intervenor, ROLM Corp.

Laurence W. Katz and Robert A. Levetown, Washington, D.C., entered appearances for intervenors, Bell Atlantic Telephone Companies, et al.

Gerald E. Murray and John Messenger, New York City, entered appearances for intervenor, NYNEX Corp.

Alfred Winchell Whittaker, Washington, D.C., and Thomas J. Reiman, Chicago, Ill., entered appearances for intervenor, Ameritech Operating Companies.

Before WALD, Chief Judge, and BORK * and SILBERMAN, Circuit Judges.

Opinion Per Curiam.

PER CURIAM:

The Federal Communications Commission approved the transfer from the local exchange telephone companies, then owned by the American Telephone and Telegraph Company ("AT & T"), to AT & T Information Systems, Inc. ("AT & T–IS") of the local telephone companies' business in commercial customer premises communications equipment. Petitioners Equipment Distributors' Coalition and North American Telecommunications Association challenge two aspects of that approval. First, petitioners claim that the Commission unreasonably approved an anticompetitive practice by allowing AT & T–IS to enforce early termination charge provisions in leases for this equipment. We hold that the Commission acted reasonably. Second, petitioners claim that the Commission unreasonably transferred deferred tax accounts attributable to the equipment from the local companies to AT & T–IS. We dismiss this claim as not properly before us.

## I.

### A.

This case concerns fixed-term contracts for the lease of commercial telecommunications equipment, such as private branch exchanges, located at the customer's place of business. The terms and conditions of the sale or lease of such customer premises equipment ("CPE") were formerly subject to tariffs established by state regulatory agencies.

During the 1970s, a number of firms began to offer CPE to commercial customers. CPE formerly had been available solely for an indefinite term at a recurring month-to-month charge from the local telephone companies. The new entrants to the equipment market also offered CPE customers new financial arrangements such as installment sales contracts and long-term leases. In response, the telephone companies began to offer CPE to customers under fixed-term contracts. These contracts required the customer to lease the equipment for a specified minimum period of time and set a monthly lease rate sufficient to recover most of the capital costs attributable to the equipment during the contract period. Although the contracts took various forms from state to state, every contract provided that the telephone company could not change the portion of the contractual rate representing capital recovery.

Since the contractual lease, unlike the indefinite month-to-month leasing arrangement, required the customer to hold the equipment for a fixed term and to pay a fixed monthly amount toward expenses and capital costs, it gave rise to an assured revenue stream for expense and capital recovery that enabled the telephone companies typically to set the monthly rate under the contract below the level a month-to-month arrangement would require. The contract permitted customer termination of the lease prior to its contractual expiration, but imposed additional charges for premature termination which varied directly with the remaining number of months in the lease term. The charges were imposed because premature termination, by cutting short the revenue stream contemplated by the contract, would otherwise result in a cost recovery below that assumed in the calculated monthly charges.

### B.

The telephone companies formerly incorporated all the rates, terms, and conditions of their CPE lease contracts into the tariffs they submitted for approval to the state utility commissions. But the Federal Communications Commission, in its *Second Computer Inquiry*, ordered that CPE could be offered for sale or lease without regulatory approval. *See* 77 F.C.C.2d 384, *on reconsideration*, 84 F.C.C.2d 50 (1980),

---

* Judge Bork was a member of the Court at the time this case was argued but did not participate in the final decision.

*on further reconsideration*, 88 F.C.C.2d 512 (1981), *aff'd sub nom. Computer & Communications Indus. Ass'n v. FCC*, 693 F.2d 198 (D.C.Cir.1982). Specifically, the Commission determined that new CPE could be offered without regulation as of January 1, 1983. 88 F.C.C.2d at 536–37. The Commission did not act on the question of how to remove CPE already subject to tariff from regulation but instead set this issue for hearing in a separate "implementation proceeding." 84 F.C.C.2d at 67, 69.

The Commission approved a plan for deregulation of tariffed CPE in the *Implementation Order*, 95 F.C.C.2d 1276 (1983), *on reconsideration*, 57 Rad.Reg.2d (P & F) 1089 (1985). This decision was made after entry of the modification of final judgment in the AT & T divestiture proceeding, which provided, in part, that AT & T, not the telephone companies to be divested, would retain the CPE business. *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 227 (D.D.C.1982), *aff'd mem. sub nom. Maryland v. United States*, 460 U.S. 1001; 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The *Implementation Order* ordered AT & T to transfer its business in CPE, on the 1984 date of divestiture, to AT & T–IS, an unregulated subsidiary that AT & T had established pursuant to the *Second Computer Inquiry*. It also provided for transitional price regulation by the Commission of CPE sold and leased by AT & T–IS, and permitted AT & T–IS to assume contractual rights and duties that the telephone companies had under the CPE leases outstanding on the transfer date. *See* 95 F.C.C.2d at 1291–93.

The *Implementation Order* also required AT & T to transfer all deferred tax reserves attributable to "embedded" CPE (equipment already leased) to AT & T–IS. 95 F.C.C.2d at 1359–65. A deferred tax reserve is an account on a firm's books that represents the accumulated tax savings resulting from deductions for depreciation as an asset's useful life diminishes. Since the tax laws deem an asset's useful life to depreciate more quickly than do the normal straight-line depreciation rules of accounting, and since depreciation in an asset's value is a charge to earnings and hence a reduction in taxable income, tax paid in earlier years will fall short of, and tax paid in later years will exceed, the amount of tax that would have been paid in those years under the straight-line method of depreciation otherwise applicable. The deferred tax account accumulates the tax saved in the earlier years. The tax expense in later years, beyond what straight-line depreciation would have generated, is charged against that accumulation.

Upon reconsideration of the *Implementation Order*, the Commission was faced, *inter alia*, with challenges to its approval of the retention of the contractual termination charges to CPE lease customers by AT & T–IS, and to the transfer of the deferred tax reserves. *Reconsideration Order*, 57 Rad.Reg.2d (P & F) at 1105–06, 1116–17. The Commission decided to consider the termination charge questions in a separate proceeding. *Id.* at 1106. But the Commission did dispose of the challenge to the transfer of CPE tax reserve accounts. *Id.* at 1116–17. Petitions for review of the *Reconsideration Order* were filed with this court by the same petitioners who are now before us, but the petitions were later voluntarily dismissed.

### C.

According to AT & T–IS, the equipment under lease transferred to it from the telephone companies comprised something less than one quarter of all CPE nationally in place on the transfer date. Moreover, the cumulative proportion of these leases to expire at year's end is approximately 20% in 1984, 61% in 1985, 69% in 1986, and 95% in 1987.

Since it took over all CPE under lease from the telephone companies, AT & T–IS has offered the contractual termination provision against any customer that ends a lease contract before its term, unless the customer ends the contract to buy the CPE leased under the contract or to replace that equipment, by purchase or lease, with new CPE from AT & T–IS. If the customer buys its leased CPE, the termination charge is waived in full, since the capital

costs and expenses it would recover are fully captured in the sale price. If the customer replaces its old CPE with new AT & T–IS equipment, the customer receives a credit to offset the termination charge in whole or in part; this credit, which may range from nothing to all of the charge, varies with the length of the remaining lease term, the quantity of equipment replaced, the type of new equipment replacing it, and the term of any lease on the new equipment.

In the *Termination Charge Order*, 100 F.C.C.2d 1298 (1985), the Commission rejected claims that these practices, and the termination charges themselves, constituted anticompetitive conduct and violated the Communications Act. The Commission decided that the charges and their application in practice were not illegal or anticompetitive but were consistent with the public interest.

The Commission first rejected petitioners' suggestion that "the termination charge provisions in the CPE lease contracts are inherently anticompetitive, in that they effectively foreclose AT & T–IS's competitors from the AT & T–IS embedded CPE market." 100 F.C.C.2d at 1308–09. The Commission noted that numerous state regulators and courts, as well as the Second Circuit, had found the charges not to be anticompetitive. *Id.* at 1309–10. It next found that the use of long-term leases was a common practice in the CPE market, to which AT & T had responded in kind. *Id.* at 1310. The Commission then concluded that the market foreclosure alleged by petitioners was materially identical to that occurring in any sale or lease, and hence was legal. *Id.* at 1310–11. Finally, the Commission found that in any event the extent of foreclosure in the CPE market was quite limited. *Id.* at 1311.

Regarding AT & T–IS's policy of enforcing the charges only against customers who purchase new CPE from a competitor, the Commission held that the policy had not in fact undermined competition in the CPE market. 100 F.C.C.2d at 1313. The Commission based this conclusion on large declines in AT & T–IS's shares of new equipment shipments and of the total outstanding equipment customer base, and on a significant decrease in CPE prices due to changing technology and the entrance of numerous new firms into the market. *Id.* at 1313–16.

## II.

■ Since petitioners' challenge to the Commission's decision rests on the assertion that the Commission ratified conduct that violates the antitrust laws, we begin with the scope of the Commission's obligation to address antitrust concerns. The Commission discharges this duty when it "seriously considers the antitrust consequences" of conduct within its regulatory jurisdiction along with its other effects on the public interest; the Commission is not charged with enforcement of the antitrust laws. *United States v. FCC*, 652 F.2d 72, 88 (D.C.Cir.1980) (en banc).

We turn to the particular conclusions of the Commission in the *Termination Charge Order* challenged by petitioners.

### A.

The Commission's first challenged conclusion is that the contractual imposition of charges for early termination of long-term equipment leases is not inherently anticompetitive. 100 F.C.C.2d at 1309–11. The Commission's conclusion is entirely reasonable.

■ Petitioners appear to argue that any charge for early termination levied by an entity possessing market power removes lease customers from the reach of the lessor's competitors for the term of the lease, and thereby results in monopolization by the lessor. Without engaging in extended antitrust analysis, for which this proceeding is not the proper occasion, we note simply that petitioners' argument boils down to the assertion that all customer contracts by a firm with market power are inherently anticompetitive. This follows because there is no difference between a firm's collecting a cost-based charge triggered by early termination of a fixed-term lease and the same firm's collecting dam-

ages arising from breach of any contract that is performed over time. Petitioners do not suggest that the termination charges here at issue are in any way disproportionate to the costs that would otherwise not be recovered on account of a customer's premature termination. *See infra* note 4. There is nothing unreasonable, to say the least, in the Commission's rejection of a position that necessarily implies that an entity with market power may not legally enter into contracts with its customers. The Commission thus correctly stated that the effect on the customer of the termination charges is "little different from that occurring anytime a supplier leases or sells any piece of equipment to a customer," transactions that remove the customer from the market for a time but are obviously not inherently anticompetitive. 100 F.C.C.2d at 1311, *citing Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 92 (2d Cir.1981); *see United States v. United Shoe Mach. Corp.*, 110 F.Supp. 295, 340 (D.Mass.1953) (monopolist's "reasonable charge for cancellation before the end of the [lease] term" not inherently anticompetitive), *aff'd*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954).

The Commission also properly relied on the fact that the telephone companies originally implemented long-term leases in response to their use by competitors and that the use of termination charges is a routine commercial leasing practice available to any lessor. 100 F.C.C.2d at 1310 & nn. 43–44. *Accord Northeastern Tel. Co.*, 651 F.2d at 93 (telephone equipment leases with termination charges not anticompetitive but a competitive use of an ordinary marketing method available to all in market); *see Telex Corp. v. International Business Machs. Corp.*, 510 F.2d 894, 926–28 (10th Cir.1975) (Sherman Act does not prohibit firm with market power from adopting legal and ordinary marketing methods already used by others in the market).

Our review of this aspect of the Commission's decision assumes, without deciding, that the telephone companies at the time the CPE leases were entered into had, and that AT & T–IS now has, market power. Petitioners have strenuously urged the importance of the "migration strategy" allegedly followed by AT & T to retain its monopolistic market position.[1] Petitioners allege that as part of this strategy the telephone companies used their dominant position in the equipment market to "coerce" CPE customers into long-term equipment leases with termination charges. To allege this coercion is simply more colorfully to say that the telephone companies exercised market power. While the Commission noted that the number of customers allegedly now removed from the CPE market "may not be as great as AT & T–IS's competitors suggest," 100 F.C.C.2d at 1311, the Commission's assessment of the termination charges' inherent illegality contained no essential step that depended on whether the lessor-telephone companies had market power. *Compare* 100 F.C.C.2d at 1311 (adverting to customer's exit from market "any time a supplier leases or sells" equipment to customer and citing *Northeastern* case) *with Northeastern Tel. Co.*, 651 F.2d at 84, 93 (termination charges by telephone company with assumed "monopoly power" lawful). Petitioners' contentions regarding the migration strategy therefore are simply irrelevant to the Commission's reasonable conclusion that termination charges are not inherently anticompetitive and consequently not contrary to the public interest.[2]

1. The "migration strategy," according to petitioners, comprised AT & T's attempt to "force early replacement of the entire installed base of terminal equipment in the United States, before AT & T's competitors were large enough to supply the demand ... [and] put in place long-term leases with termination charges, tying the embedded [CPE] base customers to AT & T until the mid–1980's." Brief of Petitioners at 9–10.

2. Petitioners' strained contention that the Commission was obliged to undertake a broad and factual investigation of this migration strategy is mistaken. All the Commission had to do, it did: It fairly considered the question of whether the termination charges were contrary to the public interest. Nothing required the Commission, in the termination charge proceeding, to embark on a fishing expedition for any anticompetitive practices in some way arguably related to CPE. Petitioners are free, through a suit in district court under the antitrust laws, to pursue any of their claims of anticompetitive activity.

### B.

Petitioners also challenge the Commission's approval of AT & T–IS's policy of waiving termination charges for lease customers who purchase or lease new equipment from AT & T–IS, and of enforcing the charges against customers who purchase or lease from competitors. The Commission's approval was reasonable.

The Commission apparently presumed that in some circumstances the selective waiver of termination charges could be anticompetitive, *see United Shoe Mach.*, 110 F.Supp. at 340, 344–45, and thus analyzed the waiver policy before us by assessing the "actual impact" of the policy on the CPE market. 100 F.C.C.2d at 1313. The Commission concluded that "the existing information on the CPE marketplace" provided no "signs that AT & T–IS's actions are undermining competition or extending [its] past market power into the future." *Id.* The Commission based this conclusion on four specific findings:

(1) AT & T–IS's share of new equipment shipments (sales or leases) has markedly declined; (2) a large number of new firms have entered the CPE manufacturing and retailing markets; (3) equipment prices have significantly dropped; and (4) AT & T–IS has lost much of the installed-equipment customer base it formerly held. *Id.* at 1313–16.

■ Petitioners respond to these findings in three ways. First, they argue that the market the Commission should have analyzed is not the market for CPE as a whole but the submarket of lessees subject to termination charges. But it is reasonable, if not indispensable, to look at the market for new CPE in assessing a claim of anticompetitive effects on competing firms who sell or lease new CPE. Furthermore, it is hornbook antitrust law that the definition of a putative monopolist's market focuses on all genuine substitutes for its product available to buyers within the relevant geographic area. *E.g.*, E. Gellhorn, *Antitrust Law and Economics* 91 (2d ed. 1981). But there is nothing in the record before us to distinguish between the CPE under lease from AT & T–IS and competitors' CPE, except for the termination charges. And the termination charges as waived by AT & T–IS simply amount to a lowering of the price for AT & T–IS's new CPE. *See* 100 F.C.C.2d at 1311 n. 49. Consequently, petitioners' position on this issue must be that the price a firm charges for its product, of itself, defines its customers for that product as a separate market. Whatever the merits of this position otherwise might be, petitioners present us with nothing to suggest that the prices charged by AT & T–IS are predatory, so that other firms could not competitively market CPE to the AT & T–IS lessees. Rather, we see no reason to doubt that competitors are free, in setting their equipment prices, to pay whatever termination charges AT & T–IS would levy on a lessee that obtains new equipment from a competitor. The Commission reasonably focused on the entire market for new CPE.

Second, petitioners suggest that the Commission mistakenly relied on the number of new equipment shipments, both because there are empirical defects in the numbers the Commission used, and because the number of new shipments pales in importance next to AT & T–IS's share of the embedded leased equipment. As to the numbers, we find substantial evidence in the record to support the Commission's factual findings. As to the propriety of the measure itself, we find petitioners' position wholly untenable. Since petitioners alleged an anticompetitive effect on new equipment sales, it is remarkable that they object to the Commission's examination of new equipment sales. Even if, for some reason that escapes us, it was proper primarily to analyze AT & T–IS's share of CPE in place, petitioners' claims of anticompetitive impact would still fail. As the Commission recognized, 100 F.C.C.2d at 1311, 95% of all the long-term leases from AT & T–IS, which amounted to no more than about 25% of all embedded CPE in 1984, will expire by the end of 1987, so that the market petitioners think important would approximate

**1204**

something like 1% of the total CPE market—a fact petitioners ignore.[3]

Finally, petitioners object to the emphasis on new shipments of equipment, as well as to the Commission's other findings of numerous new firms in the CPE market, of sharp drops in CPE prices, and in AT & T–IS's share of the installed equipment market, since all these facts, petitioners claim, are not the result of a competitive CPE market but rather are deliberately engineered components of AT & T–IS's migration strategy. Petitioners suggest that the apparently competitive CPE market is merely an illusion manufactured by AT & T–IS. We have no idea how this strategem could work. The Commission, which carefully considered all the facts and was fully aware of petitioners' migration-strategy argument, *see, e.g.,* 100 F.C.C.2d at 1312, concluded that this apparently competitive CPE market is an actually competitive CPE market.[4] It was reasonable for the Commission to conclude from its four main findings that the market for new CPE is competitive.

As the Commission recognized, AT & T–IS could achieve everything it achieves with its termination charge waivers through a lowering of the now-unregulated prices of its new CPE. 100 F.C.C.2d at 1311 n. 49. Since prices lowered to reproduce exactly the effect of the waiver would, on the record before us, remain above any measure of the equipment's costs, their legality would not be in question. *See California Computer Prod., Inc. v. International Business Machs. Corp.,* 613 F.2d 727, 740–43 (9th Cir.1979) (monopolist's responsive introduction of long-term computer leases with termination

charges at lowered but profitable price not anticompetitive); *see generally MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1112 (7th Cir.1983) (liability for pricing below cost "an exception to the general antitrust regime which contemplates that no limits on price competition shall be imposed"). So it is with the termination charge waivers themselves.

We have considered all of petitioners' other arguments on the termination charge issue and find that they lack merit. We uphold the Commission's approval of the termination charges and the policies relating to their waiver.

### III.

■ We do not reach the merits of petitioners' challenge to the transfer of deferred tax reserves from AT & T to AT & T–IS. That challenge is not properly before us.

The tax-reserve transfer issue was decided by the Commission in the *Implementation Order,* 95 F.C.C.2d at 1359–65, and affirmed by it upon reconsideration, 57 Rad.Reg.2d (P & F) at 1116–17. As previously noted, petitioners initially appealed from the *Implementation Order* but later abandoned their appeal. Petitioners now seek to revive that issue in this appeal from the *Termination Charge Order.* Petitioners base their attempt on the Commission's reference to the transfer as an element of an independent claim by petitioners, not pursued on appeal, that AT & T–IS recovered more from its termination charges than the amount of the costs it would lose by early termination. 100 F.C.C.2d at

---

**3.** Petitioners expend great energy in challenging the Commission's suggestion that "the arguments made by AT & T–IS's competitors that the CPE leases derive from a period when AT & T–IS exercised dominant control over the CPE marketplace appear to be substantially overstated." 100 F.C.C.2d at 1316 n. 74. Petitioners find this argument central because they seek to focus our attention on the competitiveness of the CPE market in the past. The Commission placed the argument in a footnote because it correctly realized that the issue before it—and before this court—is whether the selective waiver of termination charges has an anticompetitive effect on today's CPE market. The market

of the past is irrelevant—this is not a damage action for past violations of the antitrust laws.

**4.** Petitioners have at no time suggested that the lease rates minus the termination charges are below the equipment's cost. Petitioners did suggest to the Commission that the termination charges provided AT & T–IS with more revenue than that required to recover the cost of leased CPE, to the detriment of CPE lease customers. In an extended discussion, the Commission rejected this argument. 100 F.C.C.2d at 1317–26. Petitioners do not make any such argument on appeal.

1317, 1823. The Commission spoke of the transfer as an accomplished deed and explained its contribution to AT & T–IS's recovery of investment in its leased equipment.[5] Nothing in this discussion reopened the transfer itself to challenge. Accordingly, we do not address the issue except to dismiss it.

For the foregoing reasons, the petitions for review are

*Denied.*

---

5. The Commission's discussion stated:

Furthermore, we fail to discern any overrecovery deriving from AT & T's use of accelerated tax depreciation and investment tax credits. With respect to the former, in the *CPE Detariffing Order,* we found that AT & T–IS will be liable for deferred taxes on transferred equipment as a result of the BOCs having depreciated the CPE at a faster rate for tax purposes than for book purposes and having normalized the difference. These taxes will be payable by AT & T–IS in the latter part of the life of the CPE when depreciation charges for book purposes exceed those available for tax purposes or when CPE book basis exceeds its tax basis when it is sold. Accordingly, we ordered the deferred tax reserves transferred to AT & T–IS together with the associated CPE. As we explained in the *CPE Detariffing Order,* "[t]he deferred tax reserves ... will not provide any cash to make these payments to the Treasury, but they will provide AT & T–IS with an accounting entry against which to charge those payments rather than charge them against income." [99] Thus, we fail to see how the *deferred tax reserves,* which represent the tax liability AT & T–IS inherited from the BOCs as a result of the CPE transfer, reflect any overrecovery of investment on AT & T–IS's part.

99 .... We recently upheld the transfer of the deferred tax reserves to AT & T–IS in the *CPE Reconsideration Order* at paras. 78–84.

100 F.C.C.2d at 1323 & n. 99 (some footnotes omitted).